Felicia Medina (SBN 255804)
fmedina@medinaorthwein.com
Jennifer Orthwein (SBN 255196)
jorthwein@medinaorthwein.com
Shauna Madison (SBN 299585)
smadison@medinaorthwien.com
Mackenzie L. Halter (SBN 333992)
mhalter@medinaorthwein.com
MEDINA ORTHWEIN LLP
230 Grand Avenue, Suite 201
Oakland, CA 94610
Telephone: (510) 823-2040
Facsimile: (510) 217-3580

Dan Siegel (SBN 56400)
danmsiegel@gmail.com
Anne Butterfield Weills (SBN 139845)
abweills@gmail.com
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TALIB (A/K/A MARCELLE) WILLIAMS, DIMARIO PICKFORD, REGINALD GLOVER, and ROOSEVELT PAYNE, on behalf of themselves and all others similarly situated, | Case No.: 4:21-cv-09586-JST |
| **Plaintiffs,** | **FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, KATHLEEN ALLISON, CRAIG KOENIG, DERRICK MARION, BLAKE BARRON, KEITH MENSING, Y. MARTINEZ, A. VILLALOBOS, J.G. LOPEZ, H. VERA, J. K. PEFFLEY, B. COKER, R. CAVAGNOLO, J. DEANZO, and M. HERNANDEZ, | **CLASS ACTION** **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

FIRST AMENDED CLASS COMPLAINT

## I.   INTRODUCTION

*"When I was violently snatched out of my sleep and slammed into the wall headfirst off the top bunk, I thought I was dreaming."*

-Talib Williams, "They came for us in the morning," *San Francisco Bay View*

1.      Plaintiffs Talib (a/k/a Marcelle) Williams ("Mr. Williams"), Dimario Pickford ("Mr. Pickford"), Reginald Glover ("Mr. Glover"), and Roosevelt Payne ("Mr. Payne"), (together "Plaintiffs"), on behalf of themselves and similarly situated individuals, as applicable, by and through their attorneys, Medina Orthwein LLP and Siegel, Yee, Brunner, & Mehta, bring this action against Defendants California Department of Corrections and Rehabilitation ("CDCR"), CDCR Secretary Kathleen Allison, Correctional Training Facility ("CTF") Warden Craig Koenig, Office of Correctional Safety ("OCS") Chief Derrick Marion, Assistant Institutional Gang Investigator ("AIGI") Blake Barron, Assistant Chief Deputy Warden of CTF Keith E. Mensing, Correctional Officer Y. Martinez, Crisis Response Team Commander A. Villalobos, Investigative Services Unit Lieutenant J. G. Lopez, Investigative Services Unit Sergeant H. Vera, ("Defendants"),  Correctional Officer J. K. Peffley, Gang Intelligence Officer ("GIO") Correctional Sergeant B. Coker, GIO Correctional Lieutenant R. Cavagnolo, GIO Correctional Sergeant J. DeAnzo, and AIGI Officer M. Hernandez, as applicable, under 42 U.S.C. Section 1983 for violations of the First, Fourth, Sixth, and Fourteenth Amendments of the United States Constitution, under California Civil Code Section 51.7, and under California Government Code Section 820 for Negligence and Battery.

2.      In so doing, Plaintiffs and the class seek their day in court and to hold CDCR accountable for violating the Constitution of the United States and the State of California.  The allegations set forth herein are shocking to the conscience, and part and parcel of CDCR's history of documented violence against Black incarcerated people—particularly Black people who dare to advocate for Black liberation and who expose CDCR's gross abuses of power and cruel punishment inflicted on Black lives.

3.      On July 20, 2020, Plaintiffs, along with 200 Black incarcerated people, were rounded up in chattel fashion in the middle of the night during the height of the COVID-19 pandemic ("the Raid"). They were beaten and handcuffed close together for hours without proper clothing or personal protective equipment.  Those taken from their cell, including Mr. Williams, Mr. Pickford, Mr. Glover, and Mr. Payne, were questioned about the Black Lives Matter ("BLM") movement and affiliation with various Security

Threat Groups ("STG") (commonly known as "prison gangs"), including the Black Guerrilla Family ("BGF"), a prison political movement which arose in response to abuse against Black incarcerated individuals in the 1970s.

4.     Many who were targeted in the Raid contracted COVID-19, which caused a spike among the general population.  After the Raid, approximately 50 Black incarcerated people were wrongfully validated as being affiliated with an STG.  Being labeled with STG connections leads to harsh and disparate treatment, longer prison sentences, and ongoing violence and intimidation by CDCR officials. Correctional officers were permitted to torture Black incarcerated people with impunity, before, during, and after the Raid.  Defendant Warden Koenig, on sight and on duty during the Raid, was seen high-fiving officers and congratulating them for a "good strike."

5.     California courts have overseen lawsuits and class actions that have exposed CDCR's encouragement of race wars, gladiator fights, suppression of free speech, and the discriminatory targeting of Black lives.[1]  CDCR is misusing common policies surrounding security threat group validations, solitary confinement, and prison yard policies to destroy prisoner instigated racial peace accords and other race-based liberation and advancement efforts.  This abuse of power involves top leadership in CDCR and the OCS, correctional officers, and correctional officer associations.  Unsurprisingly, the Raid coincided with the Black Lives Matter movement protests that are wrongly viewed by CDCR as a "kill or be killed" attack on law enforcement.  The Raid was carried out with the goal of inciting fear in Black incarcerated people for, as one officer told Mr. Williams, "Being Black."

6.     Plaintiffs and the Class seek reprieve from the state-sponsored terror that is their norm. Through injunctive, declaratory and compensatory relief, they seek to change CDCR's unconstitutional policies regarding STG validation.  This relief is necessary to stop the violence, change CDCR policy, and compensate the class for the degradation they have suffered.

## II.     THE PARTIES

7.     **Plaintiff Talib Williams** (whose legal name is Marcelle Williams) is a Black man incarcerated at the California Training Facility ("CTF") in Soledad, California.  Mr. Williams has been in

---

[1] *See Castillo v. Alameida,* (N.D.Cal. Nov. 15, 2004, No. 3:94-cv-02847-MJJ); *Mitchell v. Cate* (E.D.Cal. Sep. 8, 2015, No. 2:11-cv-1240 JAM AC P); *Ashker v. Brown* (N.D.Cal. Mar. 13, 2012, No. C 09-5796 CW).

the custody of the CDCR since 2005, and his CDCR number is V96247.

8. **Plaintiff Dimario Pickford** is a Black man incarcerated at CTF in Soledad, California. Mr. Pickford has been in the custody of CDCR since 2010, and his CDCR number is AF4206.

9. **Plaintiff Roosevelt Payne** is a Black man incarcerated at CTF in Soledad, California. Mr. Payne has been in the custody of CDCR since 2003, and his CDCR number is V07431.

10. **Plaintiff Reginald Glover** is a Black man incarcerated at CTF in Soledad, California. Mr. Glover has been in the custody of CDCR since 1992, and his CDCR number is H56475.

11. **Defendant California Department of Corrections ("CDCR")** is the State of California acting through the agency that operates and administers CTF. CDCR receives federal funds from the United States Department of Justice and other federal agencies. As such, CDCR is legally required to conduct its activities in a racially non-discriminatory manner.

12. **Defendant Kathleen Allison** is or was the Secretary of CDCR. As Secretary, Defendant Allison has ultimate responsibility and authority for the operation of CDCR, including the administration and implementation of CDCR's policies and procedures, including ultimate authority to certify Security Threat Groups. Defendant Allison is sued in her official capacity.

13. **Defendant Craig Koenig** is or was the Warden of CTF. As Warden, Defendant Koenig has ultimate and direct authority over CTF, including the administration and execution of policies and procedures and ensuring compliance with state and federal laws governing employees and people in custody. Warden Koenig also has supervisory authority over correctional staff, including responsibility for Institutional Gang Investigators at CTF. Specifically, he has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff as the "Hiring Authority." He also has the ultimate authority to oversee, review, and approve investigations into grievances and staff complaints as the "Reviewing Authority." Defendant Koenig was present at the Raid on July 20, 2020 and responsible for the organizing and overseeing of the Raid. Defendant Koenig is sued in his individual and official capacities.

14. **Defendant Derrick Marion** is or was Chief of the Office of Correctional Safety ("OCS"). As Chief, Defendant Marion has authority over all OCS staff and operations, including the Special Services Unit (formerly known as Investigative Services Unit), the primary departmental gang

management unit, which conducts gang related investigations of incarcerated individuals. Upon information and belief, OCS is responsible for gang validations within CDCR, including individual validations and validation policies generally, and was involved with the planning and execution of the Raid on July 20, 2020. Defendant Marion is sued in his official capacity.

15. **Defendant Blake R. Barron** is or was an Assistant Institutional Gang Investigator ("AIGI") under the Investigative Services Unit ("ISU") at CTF. As AIGI, Defendant Barron is responsible for conducting gang investigations and documenting gang intelligence and behavior in accordance with policy, preparing formal recommendations to the classification committee for placement of STG affiliates into the Secure Housing Unit ("SHU") Step Down Program ("SDP") and maintaining the local criminal gang data base system. Defendant Barron was responsible for drafting Plaintiff Williams's validation documents. Defendant Barron is sued in his individual and official capacities.

16. **Defendant J. K. Peffley** is or was an ISU Sergeant at CTF. As an ISU Sergeant, Defendant Peffley was directly involved in Operation Akili. Defendant Peffley was outside the room where Plaintiff Glover was interrogated during the Raid and searched the property removed from Plaintiff Glover's cell during the Raid. Defendant Peffley also issued a false, retaliatory rules violation reports against Plaintiff Williams and Plaintiff Glover. Defendant Peffley is sued in his individual and official capacities.

17. **Defendant B. Coker** is or was a Correctional Sergeant with Gang Intelligence Operations in the CDCR Office of Correctional Safety. As a GIO Correctional Sergeant, Defendant Coker is responsible for investigating security threat groups and authoring and issuing Security Threat Group Chronos. Defendant Coker authored STG Chronos and STG Identification Score Sheets regarding Plaintiff Payne and Plaintiff Glover. Defendant Coker is sued in their individual and official capacities.

18. **Defendant R. Cavagnolo** is or was a Correctional Lieutenant with Gang Intelligence Operations in the CDCR Office of Correctional Safety. Defendant Cavagnolo is responsible for investigating security threat groups and authoring and issuing Security Threat Group Chronos. Defendant Cavagnolo co-authored the 128-B5 Chrono recommending that the OCS and Institutional Classification Committee consider validating Plaintiff Payne as a member of the Hoover 74th Street Crips STG-II. Defendant Cavagnolo is sued in their individual and official capacities.

19. **Defendant Keith E. Mensing** is or was Assistant Chief Deputy Warden of the California

Training Facility. Upon information and belief, as ACDW, Defendant Mensing is tasked with chairing some Institutional Classification Committee and Unit Classification hearings held at CTF. Defendant Mensing was responsible for chairing the October 6, 2020, Security Threat Group Unit Classification hearing wherein Plaintiff Williams was validated as BGF despite due process violations and Plaintiff's protestations against the process and his alleged association with BGF. Defendant Mensing also disapproved of the grievance filed by Plaintiff Payne which opposed his gang validation and contested the claims that he admitted he was a member of an STG. Defendant Mensing is sued in his official capacity.

20. **Defendant J. DeAnzo** is or was a Correctional Sergeant with Gang Intelligence Operations in the CDCR Office of Correctional Safety. Defendant DeAnzo is responsible for investigating security threat groups and authoring and issuing Security Threat Group Chronos. Defendant DeAnzo interrogated Plaintiff Payne during the Raid on July 20, 2020, and co-authored a falsified Chrono that contributed to Plaintiff Payne's STG validation. Defendant DeAnzo is sued in their individual and official capacities.

21. **Defendant M. Hernandez** is or was an AIGI Officer under the Investigative Services Unit at CTF. As AIGI, Defendant Hernandez is responsible for conducting gang investigations and documenting gang intelligence and behavior in accordance with policy, preparing formal recommendations to the classification committee for placement of STG affiliates into the SHU SDP, and maintaining the local criminal gang data base system. Defendant Hernandez interrogated Plaintiff Payne during the Raid on July 20, 2020, and co-authored a falsified Chrono that contributed to Plaintiff Payne's STG validation. Defendant Hernandez is sued in his individual and official capacities.

22. **Defendant Y. Martinez** is or was a correctional officer within the California Department of Corrections and Rehabilitation and an employee at CTF. Defendant Martinez was present and directly involved in the Raid on July 20, 2020. Defendant Martinez is sued in his individual and official capacities.

23. **Defendant A. Villalobos** is or was Crisis Response Team ("CRT") Commander for CTF and/or CDCR. Crisis Response Team members are specially trained and equipped peace officers responsible for conducting tactical and negotiation operations. Defendant Villalobos was present during the Raid on July 20, 2020 and participated in an interview regarding an investigation into the treatment received by Plaintiff Williams and the Class during the Raid. Defendant Villalobos is sued in his individual and official capacities.

24. **Defendant J.G. Lopez** is or was an Investigative Services Unit ("ISU") Lieutenant. The ISU is within the Office of Correctional Safety and is responsible for various gang validation related investigations and processes. Defendant Lopez was present during the Raid on July 20, 2020, and participated in an interview regarding an investigation into the treatment received by Plaintiffs and the Class during the Raid. Defendant Lopez is sued in his individual and official capacities.

25. **Defendant H. Vera** is or was an Investigative Services Unit Sergeant. The ISU is within the Office of Correctional Safety and is responsible for various gang validation related investigations and processes. Defendant Vera was present during the Raid on July 20, 2020, and participated in an interview regarding an investigation into the treatment received by Plaintiffs and the Class during the Raid. Defendant Vera is sued in his individual and official capacities.

## III. <u>JURISDICTION</u>

26. This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343.

27. Venue is appropriate in this judicial district pursuant to 28 U.S.C. Section 1391(b)(2). The events giving rise to the claims occurred in this District.

28. Plaintiffs have exhausted administrative remedies regarding the claims contained herein.

29. On November 16, 2020, Mr. Williams filed an initial Government Claim Form regarding the July 20, 2020 Raid. On March 20, 2021, Mr. Williams's attorney, Jennifer Orthwein, filed an amended Government Claim form on his behalf. On June 11, 2021, the California Department of General Services issued a response rejecting "Claim 21000695 for Marcelle N. Williams V69247 against the Department of Corrections and Rehabilitation." The response stated, "[s]taff completed its investigation of your claim and rejected it for the following reasons. The claim involves complex issues that are beyond the scope of analysis and legal interpretation typically undertaken by the GCP. Claims involving complex issues are best determined by the courts. Therefore, staff did not make a determination regarding the merit of the claim, and it is being rejected so you can initiate court action if you choose to pursue this matter further."

## IV. <u>FACTUAL BACKGROUND</u>

### A. **Plaintiffs' Backgrounds**

30. Plaintiffs have each been incarcerated for long periods within CDCR. None have a recent history of violence or gang-related activity during their incarceration.

31.     Mr. Williams has been behind bars since he was 17 years old.  Throughout nearly two decades of incarceration, Mr. Williams has educated himself and others on issues of systemic racism and toxic masculinity.  He has authored three books while incarcerated, started a non-profit organization, became a respected Imam in the prison's Muslim community, and facilitated a toxic masculinity workshop for incarcerated people.  The latter of which was the subject of a CNN documentary entitled "The Feminist on Cellblock Y."  He has published several articles in the *San Francisco Bay View*, including, "Soledad uncensored: Racism and the hyper-policing of Black bodies, Part 3," "Soledad uncensored: Racism and the hyper-policing of Black bodies, Part 2," and "They came for us in the morning: What prison officials don't want you to know about the raid on incarcerated Black people at Soledad."

32.     Mr. Pickford has been incarcerated since 2010.  He too co-facilitates groups, including Success Stories, which brings incarcerated men and male youth together to discuss toxic masculinity, overcoming adversity, and engaging in critical self-reflection.  Mr. Pickford works as an electrician.

33.     Mr. Payne has been incarcerated since 2003.  He has been disciplinary free for nearly ten years and has no classification points due to behavior while incarcerated.  He actively programs and has been involved with many groups during his incarceration, including the Youth Offender Program, anger management, and Life Awareness, among others.  Mr. Payne has a building maintenance certificate and is working towards obtaining his G.E.D.  He works in the kitchen as a dishwasher and in the yard on the work crew.

34.     Mr. Glover has been incarcerated since 1992. He has been employed with Healthcare Facilities Maintenance Program through the California Prison Industry Authority for over two years.  Mr. Glover participates in an array of rehabilitative programming, including self-help groups, volunteer work, and restorative justice programs.  Mr. Glover facilitates self-awareness and improvement groups has participated in programming to support youth in the community.  He embraces and exhibits pro-social behavior and activity.  He has not engaged or been involved in any violent activity for over two decades. Until he was given points toward STG validation because of the July 2020 Raid, he had no history of any gang-related activity.  He has received laudatory Chronos for his charitable contributions and participation in self-help programming.

35.     CDCR has targeted Plaintiffs with constant cell searches, aggressive campaigns to validate

them as members of STGs, including the Black Guerilla Family (a defunct organization CDCR has labeled an STG), retaliatory Rules Violation Reports ("RVRs"), and the violent Raid on July 20, 2020, during which they were torn from their beds in the middle of the night and detained in the CTF cafeteria—unmasked during the peak of the COVID-19 pandemic—with approximately 200 other Black incarcerated people.

**B.      CDCR Has a History of Targeting, Dividing, Isolating and Punishing People in Custody to Suppress Racial or Ethnic Solidarity and Peace Accords.**

36.      Throughout the previous two decades, CDCR has been the subject of multiple lawsuits regarding ongoing incremental releases, racial segregation, and gang validation policies that run afoul of incarcerated individuals' constitutional rights.  In 2011, people incarcerated in CDCR institutions began statewide hunger strikes to nonviolently protest indefinite solitary confinement.  The first strike drew 6,600 participants statewide, the second, 12,000, and a third in 2013, 30,000 participants—the largest prison hunger strike in history.

37.      In August 2012, the leaders of Black, white and Latinx groups from the Pelican Bay SHU organized to draft the Agreement to End Hostilities ("AEH"), which condemned CDCR's divide-and-conquer method and called for an end to more than 20-30 years of hostilities between racial groups.  The AEH was premised on the groups' recognition that the tactics used by CDCR created conditions that produced the prison gangs CDCR punished to escape psychological and material scarcity over material resources.  A representative from nearly every known group signed the AEH, and it successfully cut the amount of violence occurring on prison yards throughout the state in half.

38.      In 2015, CDCR reached a settlement in *Mitchell v. Cate* which prohibits CDCR from implementing race-based lockdowns.  The *Mitchell* court found that CDCR assigned all prisoners to one of four racial groups: Black, white, Hispanic, or other.  Prisoners were then subject to lockdowns according to their assigned racial group during conflicts.  The settlement prohibits CDCR from implementing race-based modified programs or lockdowns but allows them to impose modified programming and lockdowns on people who have been labeled with an STG status.

39.      In spite of *Mitchell v. Cate*, CDCR has continued to find ways to target people or groups by race and torture them via its arbitrary and stigmatizing STG validation process, incremental releases,

modified programs, and lockdowns. CDCR's validation policies, operationalized by the OCS and overseen by Defendants Allison and Marion, violate the rights of incarcerated individuals. CDCR officials, including Defendants Allison, Marion, and Koenig, are aware of the constitutional injuries as a result of that lawsuit as well as the use and increase of post-*Mitchell* STG race-based validation to enact race-based lockdowns, raids, modified programs, gladiator fights, and other racially motivated population control measures. They are also aware, or should have known, of the constitutional injuries that result from the STG policies.

40. The STG validation policies, which target people based on their race and use religious, ancestral, and historical symbols and writings to affix an oppressive and dangerous STG label, are the moving force behind the constitutional violations.

41. By habitually creating conditions that guarantee the emergent organization of prison gangs to escape psychological and material scarcity, the prison guarantees competitive violence over scarce resources. To undermine solidarity among prisoners, it is CDCR policy to ignore the AEH and, under the cynical cover of "desegregating prisons," to release signatories of the AEH into yards with non-signatories under a policy known as "incremental release."

### C. CDCR's Validation Policies and Procedures Intentionally Discriminate Against People in Custody Based on Their Race.

*"Revolutionaries don't come to prison, they are created by it; and California, [George] Jackson points out, creates more than their share of revolutionaries."*

-Talib Williams, *Annotated Tears Vol:2: Soledad Uncensored*

42. Black incarcerated people—especially those who research or embrace revolutionary ideologies reminiscent of the Black Power movement —continue to pay the price for political speech and activism. CDCR employs common and uniform STG validation processes and procedures that allow its officers to intentionally target politicized Black incarcerated people for STG validation.

43. CDCR employs a three-tiered system of validation. An individual can be identified as a member, an associate, or a suspect.

44. For a person in custody to be validated as a member of an STG, Institutional Gang Investigators ("IGI")—the prison administrators responsible for seeking out, identifying, and validating

gang members—must identify three independent sources of evidence which purportedly establish gang association or membership.[2] The sources can include information provided by confidential informants, admissions, tattoos, symbols, photographs, books, newsletters, written and verbal communications, an individual's commitment offense, discovery of the name of a validated BGF or other STG member in an individual's possession, and visitors, among other sources.

45. At least one of these sources must provide a "direct link" to a current or former validated gang member, and all of these sources must contain "factual information."[3] After the IGI collects sources of evidence to validate an incarcerated person as a gang member, the validation process is as follows: (1) the IGI discloses source items that will be used in the validation process against a suspected incarcerated person;[4] (2) the IGI interviews the person being validated, during which time the person being validated can respond to the non-confidential source items; (3) the IGI sends a validation package, which includes the source items and the interview, to the Office of Correctional Safety; (4) the Office of Correctional Safety determines if the person being validated is a member, associate, or dropout of a gang and if their association is active or inactive; (5) if validated, the classification committee where the incarcerated person is housed determines if the validated STG member will be housed in solitary confinement or the general population.[5]

46. Incarcerated individuals who are targeted by IGI may also be validated as an associate to an STG. To be validated as an associate, an IGI must follow the same procedures and standards as described above, but only meet the standard that an individual is involved "periodically or regularly" with members of an STG.[6]

47. An individual may also be targeted as an STG Suspect, a designation that requires far less evidence: a suspect requires two or more points and may be identified by an IGI but does not require OCS

---

[2] 15 CCR 3378(c)(8).
[3] 15 CCR 3378(c)(2), 15 CCR 3378 (c)(3).
[4] Source items such as symbols or materials are not pre-designated or known prior to validation, such that an individual may not be aware that a symbol or book of which they are in possession may be used as a validation point until they have been notified of the validation itself. Furthermore, information regarding the identity of confidential informants may be and often is withheld for purported security purposes, which are not explained.
[5] 15 CCR 3378.
[6] 15 CCR 3000.

validation review. "Suspects" will be tracked for intelligence purposes during an unspecified amount of time, which provides opportunity for CDCR officials to engage in repeated raids of an incarcerated individual's cell on suspicion of gang activity.[7]

48. Ultimately and regularly, STG validation is not the result of gang activity, but rather, the result of IGI surveillance of incarcerated peoples' property, speech, and correspondence and its attempt to link those source materials to an STG. This is done in a manner to abuse power and subject Black incarcerated people to heightened scrutiny and civil rights abuses.

49. For Black incarcerated people, including Class Members, the primary and often sole factor CDCR relies upon to link source materials to BGF or other STG activity is their race. CDCR deploys its policies to intentionally target, criminalize, and silence expressions of Black political thought and culture. Per policy, Class Members have been validated as STG members, associates, or suspects for possessing books and written materials that reference Black political thought, including the Black Power movement, the Black Panther Party, Black August,[8] George Jackson, and Angela Davis (a prison abolitionist). They have also been validated for possessing photos of Black political leaders, and for discussing the ideas championed by these leaders. As described in more detail below, Mr. Williams's validation explicitly links what the institution considers BGF activity to education in the areas of "civil rights, social justice, revolution, and African American History."

50. Class Members have also been validated as STG for unintentionally possessing materials that discuss Black history and politics: for instance, when California Prison Focus, an organization that investigates prison conditions, included an article on Black August in its newspaper, the organization received numerous letters from Black incarcerated people who said that the newspaper was being used as a source item to validate them as BGF or other STG members.

51. Under CDCR guidelines, these photos, written materials, and ideas—even if these source items are completely unrelated to "planning, organizing, threatening, financing, soliciting, or committing unlawful acts or acts of misconduct"—become "gang materials" or evidence of "gang activity" if the

---

[7] 15 CCR3378.

[8] Black August is an annual holiday that honors resistance against racial oppression and Black freedom fighters inside and outside of prisons.

individual possessing the items is Black.[9]  In other words, a non-Black person in custody cannot be validated as a member of BGF for possessing the same written materials that could be used to validate a Black person in custody.

52.     In addition to conflating Black political ideology with gang activity, CDCR validates Class Members for possessing or wearing symbols that it deems demonstrate affiliation with BGF or other STGs.  For instance, CDCR has determined that images of dragons and stars represent alignment with BGF.  Since information regarding affiliation images is not made available, a Black incarcerated person with a dragon or star tattoo could be flagged as an STG member or affiliate despite being unaware that such common symbols are considered source items.  Non-Black incarcerated individuals with the same tattoo or symbol will not be validated as BGF.  Upon information and belief, CDCR has validated dozens of Class Members, including Mr. Williams, for having tattoos and images of dragons and stars.

53.     Black incarcerated individuals are also targeted for possession of a name or contact information of other Black individuals, if that individual is a validated associate or member of BGF or other STG, regardless of the reason they are in possession of the name or whether they are aware the person is associated with BGF or another STG in any way.[10]

54.     By basing gang classification on race and subjecting Black individuals to validation based on their thoughts, associations, and race rather than their actions, Defendants have deprived Plaintiffs and the class of their constitutional right to be free from racial discrimination and their right to First Amendment protections.

55.     Defendants' policies, as written and as applied, severely limit Black individuals' ability to associate with one another, read and discuss Black history, or freely express their spiritual, political and other beliefs on their body and on paper.

**D.  CDCR Aggressively and Violently Targets Black People in Custody for BGF Validation.**

*"They know we are not members of the Black Guerilla Family, but they also know that, in a society so deeply connected to racist ideas concerning prison, that incarcerated Black men are seen as perpetually criminal, and thus labeling us as BGF places a stigma on us that will*

---

[9] *See* 15 CCR 3000.

[10] Both Mr. Pickford and Mr. Glover retained the names of another person in custody to invite them to a program they facilitated.  Those names were then used as source items against Mr. Pickford and Mr. Glover.

---

*last throughout the duration of our incarceration, and becomes a barrier in the way of our release. These are the lengths they will go to."*

-Talib Williams, "They came for us in the morning," *San Francisco Bay View*

56.     On July 20, 2020, at approximately 3:00 a.m., CDCR officers – believed to be from the Special Services Unit ("SSU"), IGI and OCS – dressed in full riot gear, tore approximately 200 Black people at CTF from their beds, slammed them to the ground or against their cell walls, handcuffed and zip-tied their hands, and dragged them out of their cells.  Some officers placed Black incarcerated people in chokeholds and headlocks, pushed them down the stairs, punched and kicked them, and placed their knees on their victims' necks in the same manner that George Floyd was brutally murdered.  Barefoot and unmasked—wearing nothing but boxer briefs—200 Black people were forced out of their housing units and led towards the dining hall.

57.     After being beaten and brutalized by CDCR officers, all 200 Black incarcerated people sat shivering on stainless steel stools in the dining hall with their hands zip tied behind their backs— unmasked, barefoot, and practically naked.  The detainees demanded medical attention as well as masks. Dozens of SSU officers, IGI officers, and CDCR correctional officers stood by and ignored their cries for help.  Instead, the officers screamed: "I hope you motherfuckers get COVID!" and "Black lives don't matter!" One officer in the gun tower pointed his rifle at the detainees while they chanted "Black lives matter!"

58.     Plaintiffs were each brutalized and detained during the Raid.  When Mr. Williams complained to one of the officers involved in the Raid about his abuse, the officer told him, "You shouldn't have been Black."

59.      During the Raid, Officers covered their name tags with tape, though Plaintiffs recognized Officer Martinez, a known racist with multiple complaints against him for making racist comments and attempting to incite hostilities between Black and Latinx people at CTF.  CTF Warden Koenig was also present during the Raid and was observed high fiving the officers, yelling, "Good strike!"  Upon information and belief, Crisis Response Team Commander A. Villalobos, Investigative Services Unit ("ISU") Sergeant H. Vera, ISU Lieutenant J. G. Lopez, ISU Sergeant J.K. Peffley, Correctional Officer B. Barron, AIGI Officer M. Hernandez, and GIO Correctional Sergeant J. DeAnzo were all present and participated in the Raid.  Defendants Villalobos, Vera and Lopez then participated in interviews regarding

the investigation of the Raid and engaged in a conspiracy to conceal the unlawful actions of the Raid by falsely stating that the Raid detainees were given access to restrooms, were spaced six feet apart, that none requested medical attention, and that the staff participating in the Raid wore personal protective equipment and did not use derogatory or inappropriate statements. Defendants Coker and Cavagnolo authored Chronos classifying Plaintiffs as STG members or suspects.

60. While detainees were packed in the dining hall, zip tied and cold, for approximately six hours they were also subjected to visual cavity searches without privacy and escorted to offices where they were again forced to strip naked while officers took photographs of their bodies.

61. Plaintiffs and the class were then interrogated about their feelings regarding Black Lives Matter and the prevalence of support for Black Lives Matter within the prison. Some were also interrogated about alleged associations with BGF. Upon information and belief, these interviews were recorded. When the detainees were finally released, many returned to cells that had been looted by IGI, SSU and OCS officers. In some instances, class members were deprived of their property for nearly two months, including addresses of family members and friends, writing supplies, and legal paperwork.

62. On July 21, 2020, Mr. Williams learned that CDCR referred to the Raid as "Operation Akili." "Akili" is a Swahili word that means intelligence. There has been no Black gang activity at CTF for years, and none of CTF's program status reports within the last three years refer to any Black STG activity—not even in the days leading up to the Raid.[11] Despite this, CTF attempted to justify its actions by claiming that those targeted were suspected gang members. Indeed, in the week following the Raid, an estimated 50-70 class members received validation packets identifying them as suspects, associates or members of an STG. Although class members have received notice by the institution that the Raid was conducted in response to potential STG activity, interviews made clear that the purpose was to determine whether they followed or supported ideology related to Black Lives Matter and to threaten them against such beliefs.

---

[11] Program Status Reports from 2017-2020 indicate no STG associated with Black people in custody was among the "affected" groups, meaning Black people in custody had not been explicitly subjected to modified programs or lockdowns for violent activity at CTF during the three years preceding the Raid. They were, however, impacted by the modified programs and lockdowns of other racial/ethnic groups given the institution's need to separate affected groups and limited resources.

---

63. Defendants Allison, Koenig and Marion are aware their STG validation policies target individuals based on race and religious and political beliefs and subject them to inferior conditions of confinement. Further, the application of the validation policies is rife with procedural violations. For instance, following the Raid, many of those who received validations appealed the decisions due to insufficient evidence and process violations in the investigations, including Mr. Williams, Mr. Pickford, Mr. Glover, and Mr. Payne. Accordingly, CDCR's policies are the moving force behind the constitutional violations alleged herein, and Defendants Allison, Koenig and Marion are the proper defendants to enact the equitable policy reform demanded herein.

64. Defendants Koenig, Marion, Martinez, Villalobos, Lopez, Vera, Peffley, DeAnzo, and Hernandez conspired to conduct the Raid based on race in the aftermath of certain BLM political uprisings, with the intent to violate, or with reckless disregard of, Plaintiffs' and the Class's rights, and conspired to cover up the constitutional transgressions. Upon information and belief, these Defendants used personal and work devices to plan the Raid, brought in CDCR staff from other institutions, concealed their identities, and failed to give truthful information in subsequent investigations. They also agreed to operate under a code of silence and mutual aid to avoid accountability for their actions.

### E. CDCR Unlawfully Suppresses Speech and Association by Targeting Black Individuals for Validation.

*"The times in which we live make it imperative that we understand deeply, our history in order to provide an accurate assessment that can be utilized towards shaping a more equitable future, particularly for oppressed people. The problem is, for decades, the study of Black American history has been criminalized by certain elements in California's Department of Correction and 'Rehabilitation,' to the point that people are literally afraid to study their own history in fear of being associated with a Security Threat Group (STG)."*

-Talib Williams

65. On the first day he arrived at California Men's Colony in 2011, a lieutenant (who had a history of racist behavior towards Black people) interrogated Mr. Williams about a tattoo of a dragon on his back. The lieutenant insinuated that the tattoo could be used as a source item to validate Mr. Williams as a member of BGF. He photographed Mr. Williams's tattoo and told him that "they" would be watching Mr. Williams while he remained at "his" institution.

66. Mr. Pickford first received a suspect classification following the July 20, 2020 Raid. The

classification resulted from officers finding a piece of paper with another incarcerated person's contact information on it – contact information of which Mr. Pickford was in possession to invite the individual to the course Mr. Pickford co-facilitates. Following his validation as a suspect, Mr. Pickford has already experienced an increase in abusive searches to which CDCR subjects STG suspects, including an invasive cross-gender, public strip search allegedly conducted to view Mr. Pickford's tattoos.

67.     Mr. Glover received two suspect classifications following the July 20, 2022 Raid. Mr. Glover was classified as a BGF suspect because he was in possession of a paper with another incarcerated person's name and CDCR number. Like Mr. Pickford, Mr. Glover had this information because the individual expressed interest in joining a group Mr. Glover facilitated. Mr. Glover was also classified as a Kumi suspect based on confidential information received by CDCR in 2015. Since being validated as a suspect, Mr. Glover has been denied parole, due in large part to the classifications. Mr. Glover has also sought mental health treatment for post-traumatic stress disorder brought on by the Raid.

68.     Mr. Payne was classified as an STG member following the July 20, 2020 Raid. The classification was based on tattoos he got before being incarcerated, an old drawing found in his cell, and an alleged self-admission of membership. Mr. Payne has not been involved in any STG or gang activity for over a decade. Since the Raid, Mr. Payne has experienced symptoms of post-traumatic stress disorder, and he worries that the validation will impact his ability to obtain parole in the future.

69.     One of the primary tactics CDCR has used to target Plaintiffs and the Class for validation are consistent raids of their property and person. For Mr. Williams, for instance, the question is no longer *if* his cell will be raided, but *when*: throughout the past nine years, CDCR has raided every cell in which he has been housed.

70.     During these raids, IGI officers uncover written materials, photographs, and letters—many of which are related to Plaintiff's spiritual beliefs, activism or education—which they use as source items to validate them as a member of an STG. On June 7, 2013, while Mr. Williams was incarcerated at California Men's Colony, IGI officers raided his cell and uncovered an address book with his father's name and CDCR identification number. At the time, Mr. Williams was rebuilding his relationship with his father, who had been incarcerated since Mr. Williams's youth and was validated as a member of BGF by CDCR. Unfortunately for Mr. Williams, as a Black man in custody, merely possessing his father's

name and contact information was considered by CDCR to be evidence of gang activity. Soon after the June 7, 2013 raid of his cell, Mr. Williams learned that an "Informational Chrono" had been placed in his file, noting that his possession of an address book with his father's contact information demonstrated his active association with his father and was indicative of his membership in the BGF. As a result, Mr. Williams feared, and continues to fear, having any contact with his father.

71. Following the June 7, 2013 raid of Mr. Williams's cell, CDCR continued to conduct surveillance, investigate, and target Mr. Williams to validate him as a member of BGF. After he was transferred to CTF, on June 14, 2019, Mr. Williams saw that his name was posted on a CDCR office bulletin board—visible to other people in custody—with the letters "BGF" written next to it.

72. Mr. Williams filed a 602 grievance about this incident on July 3, 2019. In CDCR's first level denial of Mr. Williams's 602 grievance, Correctional Sergeant C. Whitman notes that on June 7, 2013, while he was housed at California Men's Colony, Mr. Williams was found to be in possession of "material that associated him to a validated associate of the STG-I BGF" [i.e. his father's contact information].[12] In other words, the contact information of one individual–in this case Mr. Williams's biological father–without any additional evidence of gang related activity, was used by CDCR as a reason for increased surveillance on an individual for over six years.[13]

73. In his second level appeal (filed on September 6, 2019), Mr. Williams explained that possessing his father's contact information "had nothing to do with [] (BGF) association . . . but rather a man's desire to ascertain the reason that his father abandoned him when he was four years old." Moreover, in his second level appeal, Mr. Williams asserts that "he is not, and has never been, a member of any prison or street gang." CDCR denied Mr. Williams's second level appeal on October 18, 2019.[14]

74. Despite his best efforts to contest his BGF association, CDCR continued to pursue source items that could be used to validate Mr. Williams. Undeterred by CDCR's threats of validation, Mr. Williams remained politically active and vocal about systemic racism and CDCR's abuse of incarcerated

---

[12] Mr. Williams's first level appeal was denied on August 6, 2019.

[13] As a result of this validation experience, Mr. Williams is fearful and hesitant to continue to try and build a relationship with his father – assuming, with reason, that any further communication with him could be twisted to suggest BGF membership.

[14] Mr. Williams filed his third level appeal in relation to this incident on May 17, 2020.

people:  On March 19, 2020, Mr. Williams published *Annotated Tears, Vol 2: Soledad Uncensored*.  The book chronicles the past and present realities of racism at CTF.  It quickly gained traction across the United States and abroad.  On April 12, 2020, Mr. Williams's article entitled "Soledad Prison Guards Refuse to Wear Safety Masks Amidst COVID-19 Pandemic," was published in the *San Francisco Bay View.*

75.     In the weeks following Mr. Williams's activism, CDCR attempted to silence him by framing his political speech as evidence of gang activity.

76.     On April 21, 2020, IGI officers, including Assistant Institutional Gang Investigator Officer B. Barron, raided Mr. Williams's cell.  When Mr. Williams asked the officers why they were searching his cell, one of the officers responded, "because you're famous."  The next day, on April 22, 2020, other incarcerated people informed Mr. Williams that an officer showed them a picture of Mr. Williams and said, "We would not have raided his cell if he hadn't written an article lying on us."

77.     IGI officers returned to Mr. Williams's cell on April 27, 2020 in an effort to find more materials to accuse him of BGF membership.  The officers instructed Mr. Williams to strip naked and took pictures of the tattoos on his back: a dragon, a crescent moon and star, and an Arabic quote from the Qur'an, tattoos that had been on Mr. Williams's body for years.

78.     On May 7, 2020, Defendant B. Barron authored an Informational Chrono stating that Mr. Williams's tattoos were evidence of his BGF affiliation.  According to Defendant Barron, the dragon is a recognized symbol by the Office of Correctional Safety of BGF membership; the image of a star is representative of the Black Panther Party, and "though the star is not a recognized symbol for validation within CDCR, it should be considered an indicator along with other signs of BGF activity."  Furthermore, Defendant Barron's report states that the Arabic verse from the Qur'an (79.14) on Mr. Williams's back "translated into English as 'Assaulter, attacker with alertness'… This Arabic writing is significant to the BGF also meaning he will conduct assaults on behalf of the BGF. The Arabic writing is also indicative to the membership of the Radical Islamic Group 'Tajdeed UL-Islam ("TUI")'."

79.     Defendant Barron's characterizations of the significance of Mr. Williams's tattoos and expressions of his religious beliefs could not be further from the truth.  In a rebuttal Mr. Williams submitted to CDCR contesting his validation, he explained that he got the tattoo of a dragon, a symbol of protection in Islam, when he was a child in a maximum-security prison where he lived in fear for his life.

The crescent-moon and star is the universal symbol of Islam. Moreover, the Qur'an verse on Mr. Williams's back translates to: "and at once they will be above ground," a translation that has been verified by CTF's own Iman,[15] and the "Tajdid" tattoo on Mr. Williams's back (which Officer Barron misrepresented as "Tajdeed") is a concept in Islam that refers to returning to the humanistic teachings of Islam.

80. Defendant Barron misconstrued Mr. Williams's tattoos —common symbols that, on the back of a non-Black person, would likely be seen as self-expression—as evidence of his BGF affiliation. Indeed, during the IGI's interview with Mr. Williams on July 20, 2020, an IGI officer told Mr. Williams that if he were not Black, his tattoos would not be used as a source item to validate him as BGF.

81. On May 20, 2020, CTF received Mr. Williams's 602 grievance in relation to Defendant Barron and other IGI officers searching his cell, harassing him, and attempting to validate him as a member of BGF.[16] The same day, Defendant Barron authored another Informational Chrono regarding Mr. Williams's BGF association. In his Chrono, Defendant Barron relied solely on Mr. Williams's political activity as evidence of his BGF affiliation. He noted that upon forensic examination of the cell phone the IGI officers found in Mr. Williams's cell during their April 21, 2020 Raid, the IGI found images "pertaining to Black Panther Party ("BPP"), George Jackson and radical Islamic beliefs." Defendant Barron's Chrono also quotes a post on Mr. Williams's Instagram page, advertising his book *Soledad Uncensored,* which reads, in part:

> "George Jackson and people like him represent a threat to the system. Their critique of capitalist white-supremacy in relation to the prison system is feared because it exposes prison for what it really is: a racist, capitalist enterprise that is criminogenic by nature."

82. Beneath the quotation of Mr. Williams's Instagram post, Defendant Barron wrote, "The BGF is constantly educating its members in the area of civil rights, social justice, revolution and African American history . . . By **WILLIAMS** utilizing a contraband cell phone, it was confirmed **WILLIAMS** is generating and orchestrating BGF beliefs within as well as outside of prison walls utilizing social media platforms."

---

[15] Imam Zabi Majidzadah clarified that the quote refers to God describing the hereafter on the day of judgment, where those who had died will be given life and will be raised from where they were buried.

[16] Mr. Williams's appeal bypassed the first level of review and was denied at the second level of review on July 1, 2020. On July 21, 2020, Mr. Williams filed his third level appeal.

83.     Defendant Barron's chrono fails to note or consider the rest of Mr. Williams' book, which critiques Jackson's actions from a feminist perspective.  The book further details Mr. Williams' accounts that incarcerated individuals are moving toward non-violent means of responding to the conditions they face within the prison because of "what, in reality, can be argued is an intersectional feminist critique of Patriarchy." *ANNOTATED TEARS Vol:2: Soledad Uncensored*.  Indeed, Mr. Williams details George Jackson's life and death only in the larger context of commentary on policing and the carceral system in California as a whole.

84.     Furthermore, CTF airs a program for people in custody that provides a similar history to that which Mr. Williams wrote, inclusive of the history of George Jackson's incarceration at CTF and other historical facts associated with CTF Soledad.

85.     In the eyes of CDCR, however, Black incarcerated men who educate themselves and others on "civil rights, social justice, revolution" and their own history are not activists; they are gang members. Indeed, in his May 20, 2020 Informational Chrono, Defendant Barron writes that the images on Mr. Williams's phone and his Instagram post will be used as one independent source item towards his BGF gang validation.

**F.      CDCR Validated Plaintiffs and Others as STG Suspects, Members and Affiliates After its Raid of 200 Black Incarcerated People.**

86.     The Raid on July 20, 2020, served as an opportunity for the institution to mass-validate Black individuals who had any indicia of materials, associations, or demonstration of interest in what the CDCR deems STG affiliation.

**Mr. Williams**

87.     On July 20, 2020, IGI and STG officers at CTF raided Mr. Williams's cell at 3:00 a.m. After dragging Mr. Williams from his cell, banging his head against the wall, locking him in the dining hall with 200 other unmasked Black incarcerated men for six hours, and zip tying his hands so tightly behind his back that they turned purple, IGI officers escorted Mr. Williams to the counselor's office.[17]

88.     Once in the counselors' office, two plain clothed correctional officers interrogated Mr.

---

[17] Mr. Williams noticed that the officer who escorted him to the counselor's office held a packet that contained his picture with the word "Target" in red letters.

Williams about the Black Lives Matter movement. They asked him: "How do you feel about what happened to George Floyd? I know what the one cop did was wrong and he deserves to go to jail, but all cops aren't bad." After discussing his opinions on police brutality and racial bias, Mr. Williams asked the officers if the Raid was a reaction to the Black Lives Matter movement and George Floyd. One of the officers responded, "You have some tattoos on you that indicate you're BGF." The officers then interrogated Mr. Williams about his tattoos and BGF affiliation. Mr. Williams repeatedly told the officers that he is not a member or affiliate of BGF.

89. After an hour of questioning, Mr. Williams was finally escorted back to his cell. His cell had been raided. All of his paperwork, writing paper, envelopes, letters, pictures, photo albums, phone books, and books were gone. Mr. Williams found a "Security Squad Receipt" that said "paperwork" was the only thing the officers took from his cell.[18]

90. Using the property IGI officers took from Mr. Williams during the Raid, CTF escalated its efforts to validate Mr. Williams as a member of BGF, issuing two Chronos on July 23, 2020 and July 24, 2020 (both authored by Defendant Barron) regarding source items for his validation: (1) writing paper with quotes from George Jackson's book, *Blood in My Eye* (which Mr. Williams was using as research for his book), and (2) a "Confidential Reliable Informant" who indicated that Mr. Williams holds the Minister of Education position within BGF and is "responsible for teaching BGF literature, history, ideology, and radicalization for recruitment."

91. As a result, CTF finally had the source items it sought to validate Mr. Williams as a member of BGF: BGF "symbols" (the image of George Jackson),[19] a "direct link" to the BGF (the Confidential Reliable Informant), written materials (*Blood in My Eye*), and tattoos and/or body markings (Mr. Williams's tattoos of a dragon, crescent moon and star, and quote from the Qur'an).

92. Despite Mr. Williams's repeated attempts to contest his BGF validation, on September 23, 2020 – six years after the first attempt to validate him – a classification committee chaired by Defendant

---

[18] On July 20, 2020, Mr. Williams filed a 602 grievance in relation to the Raid and subsequent search of his cell. Mr. Williams's grievance was denied at the first level of appeals on August 27, 2020, at the second level on October 9, 2020, and at the third level on January 9, 2021.
[19] ISU officers labeled the picture of George Jackson an image in order to avoid the requirement that photographs used for validation be less than four years old.

Mensing validated Mr. Williams as a member of BGF without any evidence of gang-related activity or any history of violence while incarcerated. Mr. Williams's validation was approved by auditor M. Escobar on October 6, 2020.

93. Discussions with class members suggest IGIs used one confidential informant for many of the validations that took place following the Raid – an individual who was only briefly housed at CTF, was provided a high-level position within the prison, and who was validated right before the Raid and disappeared from the institution immediately after it.

94. Mr. Williams appealed the validation decision, claiming violation of his due process rights and improper validation. His appeal was granted at the third level on March 15, 2021, due to procedural error: contrary to policy, his hearing was not held within 30 days of the institution receiving the validation review from OCS. Although Mr. Williams's appeal regarding BGF membership was granted, notation of the validation remains in his record, and there is no indication that his documented validation will be rescinded because of the appeal. His request to have documentation of STG status removed from his records in his granted appeal did not result in a remedy. Indeed, the response specifically states that "there is no applicable remedy." To date, Mr. Williams maintains a BGF STG status in his records.

95. Although an individual may challenge their validation, successful challenge does not remove the STG marker from a person's record, nor does it make the source items unavailable for future validation purposes.

**Mr. Pickford**

96. During the Raid, Mr. Pickford was taken into the counselor's unit. He was asked about his feelings and affiliation with Black Lives Matter and whether anything would "escalate" inside the prison with respect to Black Lives Matter. Mr. Pickford was also asked about BGF, to which he responded that it was his understanding that BGF was an obsolete organization.

97. On July 20, 2020, Assistant Institutional Gang Investigator from Kern Valley State Prison, B. Cope, issued a 128-B Chrono. The Chrono details the piece of paper discovered from the Raid which contains the name and CDCR number of Mr. Smallwood, another incarcerated person, who, the Chrono states, is a validated BGF Associate. The Chrono goes on to say that they "know from training and experience that BGF members/associates give personal information to each other so they can remain in

contact . . . this enables BGF to have the capacity of relaying gang related information to members while they are incarcerated." Due to Mr. Pickford having the contact information of Mr. Smallwood with him in his personal possession, Mr. Pickford was issued one source item to be used toward validating him as a member/associate of the BGF and designating him as an STG "suspect."

98. Mr. Pickford did not learn that he had been given one point toward validation until nearly one year after the Chrono was placed in his file. On May 31, 2021, he was provided a copy of the Chrono by another officer and informed it had been placed in his file. Mr. Pickford had no opportunity when the Chrono was placed in his file to provide information regarding the association or to dispute the placement of the Chrono in his file. Under CDCR regulations, Mr. Pickford could then be properly subjected to increased surveillance due to his purported connections to BGF.

99. Mr. Pickford has no history of engaging in behavior which suggests association with BGF or any violence while incarcerated. Mr. Pickford's explanation – that he was in possession of the name and CDCR number of another person in order to connect his incarcerated brethren with a class called "Success Stories," which Mr. Pickford co-facilitates – was ignored. In fact, Success Stories' premise is bringing incarcerated men and male youth together to discuss toxic masculinity, overcoming adversity, and engaging in critical self-reflection.

100. On June 1, 2021, Mr. Pickford grieved the validation point he received. In his grievance, numbered 000000123973, he explained that he had no knowledge that Mr. Smallwood was linked to BGF, that he has no history of gang-related activity, and that he was not given notice of or the opportunity to dispute the issuance of the Chrono. Mr. Pickford received a second level response from CDCR on June 15, 2021 and subsequently received a time-expired response at the third-level on August 23, 2021.

101. Following this validation point, Mr. Pickford has seen an uptick in the number of times he is stopped for searches at work and in his cell. Mr. Pickford was recently working as an electrician in Receiving and Release ("R&R") when an Officer pulled Mr. Pickford's pants down in front of his peers, purportedly to examine his tattoos. The public, cross-gender search was so excessive, a colleague of the officer had to tell her to stop.

102. Additionally, on April 29, 2021, Mr. Pickford was given an RVR, written by Officer H. Madsen and approved by Defendant Peffley, after his cell was searched by Officer Madsen and a cellphone

was discovered. Officer Madsen told him the search was due to his suspected STG status. In the RVR, Mr. Pickford is identified as a "suspected Black Guerrilla Family (BGF) Security Threat Group (STG I) associate." This was the first indication to Mr. Pickford that he was being targeted for STG validation. Mr. Pickford was subsequently found not guilty of this RVR as the cellphone was determined to belong to his cellmate. He then received, and was subsequently found guilty of a stacked RVR for "constructive possession" of the same cellphone he had previously been found not guilty of possessing.

**Mr. Glover**

103. At approximately 3:30 a.m. on July 20, 2020, Mr. Glover woke suddenly to sounds of his cell door opening and yelling while flashlights were pointed at his face. He was dragged off his bed and out of his cell by his ankles. Mr. Glover's head was tangled in his bed sheet, preventing him from seeing what was going on around him. Once outside the cell, Mr. Glover was handcuffed, brought to his feet, and his head was freed. Defendant Peffley, who was present in the hall outside Mr. Glover's cell, smiled at Mr. Glover and said, "Good morning, Reggie."[20]

104. Correctional staff escorted Mr. Glover to the dining hall, where he was left with the 200 other Black men who were subjected to the Raid. Shortly after Mr. Glover was brought to the dining hall, Defendant Koenig entered, looked around, and shook hands with correctional staff while saying, "good job, guys."

105. Mr. Glover was brought into a small room and interrogated by correctional staff about Black Lives Matter and his involvement with BGF and Kumi.

106. While Mr. Glover was being interrogated, correctional officers entered Mr. Glover's cell and removed property to be searched on a later date. Defendant Coker and Defendant Peffley searched the property removed from Mr. Glover's cell during the Raid on July 21, 2020, and July 23, 2020, respectively.

107. Defendant Coker documented the findings of his search in a 128-B Chrono dated July 21, 2020. According to the Chrono, among Mr. Glover's property was a piece of paper with the name and

---

[20] Defendant Peffley often greets and refers to Mr. Glover as "Reggie" in the presence of other incarcerated people. This is unusual, as correctional staff almost always refer to incarcerated people by last name. By calling Mr. Glover by this nickname, Defendant Peffley is signaling to other incarcerated people that Mr. Glover has a friendly and cooperative relationship with correctional staff, putting Mr. Glover at risk.

CDCR number of Reginald Nettles. According to Defendant Coker, Mr. Nettles is a validated BGF member. The Chrono goes on to say, "[b]ased on my training and experience as an investigator, I know GLOVER being in possession of NETTLES' personal information shows a direct link to his affiliation with a member of the BGF STG-I." Due to this "direct link," Mr. Glover was given one point for personal possession of written materials related to BGF and was identified as a BGF Suspect by Defendant Coker on a STG Identification Score Sheet dated July 24, 2020.

108.    Mr. Glover's possession of the names of other incarcerated people, including individuals associated with STG groups, is common, but not because of his own affiliation with STG groups. Rather, Mr. Glover facilitates numerous self-help groups at CTF and is often approached by individuals who want to join these groups. In these situations, Mr. Glover writes down the name and CDCR number of those individuals. Mr. Glover did not know that Mr. Nettles was a validated BGF member until after he reviewed his own central file. Mr. Glover explained that he had Mr. Nettles' information to get him into a self-help group.

109.    On July 24, 2020, Mr. Glover was also identified as a Kumi African Nation Organization ("Kumi") Suspect. Mr. Glover's classification as a Kumi suspect was justified by confidential information received by CDCR staff on July 28, 2015, five years before the Raid. Defendant Coker authored the Security Threat Group Identification Score Sheet in which Mr. Glover was identified as a Kumi suspect.

110.    On June 30, 2021, Mr. Glover's suitability for parole was considered by the Board of Parole Hearings ("BPH"). The BPH Commissioners were impressed by Mr. Glover's vocational training, work history, and programming, but declined to grant parole in large part due to the consequences of the Raid: an RVR Mr. Glover was given based on the cell search and his subsequent validation as an STG suspect.

111.    On June 27, 2022, Mr. Glover grieved the Raid and his subsequent validation and an STF suspect point he received. In his grievance, numbered 000000272461, Mr. Glover requested that the STG documentation be removed from his Central File. His appeal was denied by at the institutional level on August 16, 2022. Mr. Glover appealed the decision to the Office of Appeals on September 12, 2022. Mr. Glover received a final Appeals Claims Decision Response from the Office of Appeals in November 2022, thereby exhausting his internal remedies.

/ / /

**Mr. Payne**

112.     At approximately 3:00 a.m. on July 20, 2020, Mr. Payne's cell was raided in Operation Akili.  Like the other Black people in custody at CTF, Mr. Payne was forcibly removed from his cell. After Mr. Payne was escorted out of his cell, custodial staff entered the cell and confiscated his property.

113.     During the Raid, Mr. Payne was questioned by Defendant DeAnzo and Defendant Hernandez about Black Lives Matter and BGF.  Defendant DeAnzo and Defendant Hernandez also interrogated Mr. Payne about his suspected involvement with an STG and photographed Mr. Payne's tattoos during the interrogation.

114.     On July 20, 2020, Defendant DeAnzo issued a 128-B Chrono falsely claiming that Mr. Payne admitted to being a member of the 74th Street Hoover Crip STG-II.  According to a second 128-B Chrono, Defendant DeAnzo recognized four tattoos that indicated membership with the 74th Street Hoover Crips STG-II during the interrogation.  The Chrono continues, "[b]ased on my training and experience as an investigator, I know the tattoos documented within this chrono represent PAYNE's membership to the 74th Street Hoover Crips STG-II. These tattoos display PAYNE's loyalty and allegiance to 74th Street Hoover Crips and serve as a warning to all that oppose the gang."  Each Chrono was considered an independent source item towards Mr. Payne's validation as an STG member.

115.     On July 21, 2020, Defendant Coker searched the property that was confiscated from Mr. Payne during the Raid and found a drawing with the words "Hoover Criminals."  That same day, Defendant Coker issued a 128-B Chrono regarding the drawing, stating, "I know that the Hoover Crips utilize the symbols documented within this chrono to represent membership to the Hoover Crips STG-II. The symbol displays PAYNE's loyalty and allegiance to Hoover Crips and serve [sic] as a warning to all that oppose the gang."  The Chrono was considered an independent source item towards Mr. Payne's validation as an STG member.

116.     On July 24, 2020, Defendant Coker filled out a Security Threat Group Identification Score Sheet identifying Mr. Payne as a member of the Hoover 74th Street Crip STG-II based on the source items outlined in the three Chronos.

117.     On October 13, 2020, the Institutional Classification Committee upheld the Office of Correctional Safety's recommendation that Mr. Payne be validated as a member of the Hoover 74th Street

Crip STG-II. The three Chronos were the only bases for Mr. Payne's validation as a Hoover 74th Street Crip member.

118. Indeed, in June 2008, Mr. Payne received a 128B Chrono stating that the Institutional Gang Investigations (IGI) Unit reviewed his Central File and determined that there was not enough evidence in his file to support the conclusion that he was affiliated with a gang.

119. On August 31, 2020, Mr. Payne submitted grievance number 000000035922 regarding the claims that he is a STG member because he did not admit to any current STG affiliation. Defendant Mensing disapproved Mr. Payne's grievance at the institutional level, relying on symbols and falsified documentation by Defendant. DeAnzo, Defendant Hernandez, and Defendant Coker. Mr. Payne received a final Appeals Claims Decision Response from the Office of Appeals dated January 13, 2021, thereby exhausting his internal remedies.

### G. CDCR Retaliated Against Mr. Williams for Complaining about Discrimination and for Raising Public Awareness of Systemic Racism within CDCR.

*"Prison is a different kind of monster; the weapon of choice in prison is and always has been 'documentation.'"*

-Talib Williams, "They came for us in the morning"

120. CDCR's fierce pursuit of Mr. Williams's STG validation did not deter his advocacy. On August 15, 2020, Mr. Williams's wife organized a demonstration in front of CTF to protest the Raid. And on September 2, 2020, Mr. Williams's article entitled "They came for us in the morning: what prison officials don't want you to know about the raid on 200+ incarcerated Black people at Soledad," his personal account of the Raid on July 20, 2020, was published in the *San Francisco Bay View.* Mr. Williams's article went viral, bringing the systemic cruelties that are inflicted behind the prison walls into the national spotlight.

121. The same day, on September 2, 2020, Mr. Williams's family posted an excerpt from "They came for us in the morning" on his Instagram account. The excerpt was posted alongside an image that was previously taken from a cell phone CDCR uncovered and confiscated on January 18, 2019, and for which CDCR issued an RVR against Mr. Williams. Mr. Williams pleaded guilty to this RVR when it was issued in 2019. Although the January 18, 2019 RVR had already been adjudicated, and although Mr. Williams had already been disciplined for this RVR, hours after Mr. Williams's family posted the image

on Instagram, Defendant Barron issued Mr. Williams an RVR for "constructive possession of a cellular phone." No cell phone was found on Mr. Williams's person prior to the issuance of the RVR.

122. The following day, on September 3, 2020, CDCR issued another RVR against Mr. Williams for "constructive possession of a cellular telephone" in relation to the same January 18, 2019 cell phone and the same September 2, 2020 article. In his description of the violation, Defendant Peffley wrote that "They came for us in the morning" included a photo of Mr. Williams that was taken in his cell at CTF. Defendant Peffley noted that this photo was not captured by the cell phone uncovered during the IGI's April 21, 2020 search of Mr. Williams's cell. Furthermore, Defendant Peffley acknowledged that just one day prior, Defendant Barron issued an RVR against Mr. Williams for the same violation.

123. Mr. Williams submitted evidence to Defendant Koenig, including screenshots with timestamps, demonstrating that both photographs were taken on the cell phone he had been disciplined for on January 18, 2019. In fact, these photographs were posted on social media in 2018. Furthermore, during his disciplinary hearings and in his 602-appeal regarding "stacked RVRs,"[21] Mr. Williams argued that even if the photos had been taken on different phones for which he had not previously been disciplined, the September 4, 2020 RVR and the September 3, 2020 RVR were issued as discipline against Mr. Williams for the same article he authored.

124. CDCR has shown that it will use aggressive tactics—regardless of their inhumanity or illegality— to silence Black incarcerated people who speak publicly about anti-Blackness and racially-motivated violence within CDCR. The stacked RVRs were intended to silence Mr. Williams in retaliation for writing about the atrocities of the Raid on July 20, 2020. Indeed, on September 10, 2020, Defendant Barron—who authored the September 2, 2020 RVR—told Mr. Williams, "You're screwed."

125. CDCR then chose to ignore blatant due process violations and found Mr. Williams guilty of possessing the January 18, 2019 cell phone for the second time on September 28, 2020,[22] and for the third time on September 30, 2020.[23] Moreover, Mr. Williams's disciplinary hearings were rife with

[21] Mr. Williams filed his 602 appeal for "stacked RVRs" on October 26, 2020.

[22] The September 28, 2020 hearing was in relation to the September 2, 2020 cell phone RVR and for Mr. Williams's family's Instagram post with an excerpt from "They came for us in the morning."

[23] The September 30, 2020 hearing was in relation to the September 3, 2020 cell phone RVR for a photo of Mr. Williams that was included in "They came for us in the morning."

additional due process violations, including failing to consider Mr. Williams's statement of defense in violation of PC 2932(d), failing to read Mr. Williams's written statement, denying Mr. Williams's request for witnesses, denying Mr. Williams a mental health assessment and Staff Assistant pursuant to CCR 15 Section 3315 (d), and falsely claiming in the disciplinary hearing results that Mr. Williams "elected to plead Guilty" during the September 28, 2020 hearing.

126. Defendant Barron continued to silence Mr. Williams's advocacy with retaliatory RVRs. Mr. Williams filed a 602-grievance regarding the due process violations for his stacked RVRs on October 26, 2020, and on November 1, 2020, Mr. Williams filed a 602-grievance appealing CDCR's first level denial of his complaint about the July 20, 2020 Raid. Only five days later, on November 6, 2020, Defendant Barron issued yet another RVR against Mr. Williams. This time, Defendant Barron wrote Mr. Williams up for publishing an excerpt of *Soledad Uncensored* in the *San Francisco Bay View*. In his write-up, Defendant Barron argued that Mr. Williams is "utilizing the San Francisco Bay View National Black Newspaper to promote George Jackson to show his allegiance and membership to the BGF…he is able to recruit and radically indoctrinate new members outside of the institution" and "illustrates his loyalty and oath with the BGF by knowingly promoting, furthering and assisting the BGF…as a form of indoctrination for individuals within CDCR and society."

127. Although Defendant Barron's November 6, 2020 RVR against Mr. Williams was downgraded to a "Counseling Chrono," the multiple RVRs issued against Mr. Williams will not only negatively impact his likelihood of success at his first parole eligibility hearing in 2027, they will also impact his ability to build a family: as punishment for the September 3, 2020 RVR, CDCR banned Mr. Williams from receiving family visits for five years.

128. On March 15, 2021, Mr. Williams's appeal for the charge of Possession of a Cellular Telephone was granted because Mr. Williams was "not provided all applicable administrative and due process protections." The rules violation was ordered to be reissued and reheard with a new senior hearing officer to conduct the hearing appropriately. This did not occur. Mr. Williams was not allowed to present evidence at the new hearing and the hearing officer relied on a verbatim copy of a two-year-old investigative report. No new investigation took place. Mr. Williams again filed an appeal alleging retaliation, harassment, discrimination, and a conspiracy to violate his constitutional rights.

129. Also, in the fall of 2020, Mr. Williams's mail was subjected to unlawful tampering, which resulted in the denial of permitted items sent to him by his wife and interference with the filing of legal claims related to the July 20, 2020 Raid.[24]

130. Due to injuries sustained during the Raid, Mr. Williams is restricted to lifting 19 pounds, has a permanent lower bunk accommodation because he can no longer lift himself onto an upper bunk, and continues to take medication for ongoing pain in his shoulder.

## V.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

131. Plaintiffs bring this class action on behalf of themselves and similarly situated Black incarcerated people who were subjected to the Raid on July 20, 2020 and a subclass who received a source item or were STG validated as a result of or after the Raid up to the date of trial.

132. Upon information and belief, approximately 200 Black incarcerated people were subjected to the July 20, 2020 Raid, and approximately fifty individuals have been classified as a suspect or validated as an STG after the Raid (also known as "Operation Akili").

133. Plaintiffs are members of the Class they seek to represent.

134. The race discrimination and other constitutional violations suffered by Plaintiffs and the class described in this Complaint have been, and are, continuing in nature.

### B.     Rule 23

135. This action should proceed as a class action pursuant to Federal Rules of Civil Procedure Rule 23.

136. The Class is sufficiently numerous and is estimated to include at least 50 Black incarcerated

---

[24] In the fall of 2020, an order for the book *The Purpose of Power: How We Come Together When We Fall Apart* by Alicia Garza was placed through Amazon by Mr. Williams's wife. It arrived to CTF on October 21, 2020. Mr. Williams also attempted to send a completed and signed government claim form to his wife for her to submit on his behalf, but Mrs. Williams never received the completed and signed claim form. Mr. Williams had to utilize the assistance of an attorney and legal mail to get the form out of the institution so that it could be submitted on his behalf before the six-month deadline. During this period, Mrs. Williams never received any of the multiple letters Mr. Williams had written her, nor did Mr. Williams receive any of the items his wife had sent him, including the book above and pictures from a company named "Free Prints". Mrs. Williams received confirmation that these items had indeed been delivered to CTF, yet Mr. Williams never received them.

---

people at CTF. Joinder of all class members is not possible or would be inefficient.

137. It is CDCR's standard operating procedure to discriminate against the Class because of race. The Class has been subjected to common policies producing common questions of fact and law. These questions predominate over any questions affecting only individual members. Common questions include, but are not limited to:

138. (a) whether CDCR's STG validation policies and procedures intentionally discriminate or produce a disparate impact on Black class members; (b) whether CDCR's STG validation policies and procedures stifle free exercise of speech and thought; (c) whether Defendants have engaged in a conspiracy to interfere with Black class members' constitutional rights; and (d) whether equitable remedies, declaratory relief, injunctive relief, and compensatory damages for the Class are warranted.

139. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and class members have been subjected to CDCR's common policy and practice of discriminating against Black incarcerated individuals with respect to the July 20, 2020 Raid and STG classification.

### C. Adequacy of Representation and Rule 23(b)(2), (b)(3), and (c)(4)

140. Plaintiffs can fairly and adequately protect the interests of all members of the Class. It is in Plaintiffs' best interest to prosecute the claims alleged herein to obtain injunctive relief to protect the Class from further discrimination. Plaintiffs' interests align with those of Class Members. Plaintiffs have selected counsel who have the requisite resources and ability to prosecute this case as a class action and are experienced civil rights attorneys who have successfully litigated class actions and other cases involving issues in prisons.

141. This suit is properly maintained as a class action under Federal Rules of Civil Procedure 23 (b)(2), (b)(3), (c)(4) or as a hybrid class. CDCR has implemented an unlawful scheme and common policies that are generally applicable to the Class, making it appropriate to issue final injunctive relief and corresponding declaratory relief with respect to the Class as a whole. Individual issues do not predominate. A class action is the superior and more efficient method to obtain the relief sought.

/ / /

/ / /

/ / /

# VI.   CAUSES OF ACTION

## COUNT ONE
## Race Discrimination
## Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d *et seq.*
## (On behalf of Plaintiffs and the Class Against CDCR)

142.   Plaintiffs repeat and re-allege the allegations of all the preceding paragraphs as if fully set forth herein.

143.   Title VI of the Civil Rights Act prohibits federally funded programs or activities from discriminating against people based on race or from having a racially discriminatory impact or effect.

144.   Defendant CDCR receives federal financial assistance from the United States Department of Justice and related federal entities.  CDCR is thus bound to comply with Title VI and its implementing regulations, including 28 C.F.R. Sections 42.01 *et seq*.

145.   CDCR officials conducted a raid of approximately 200 Black people solely based on their race.

146.   CDCR's STG validation procedures intentionally discriminate and/or have a discriminatory impact on Black incarcerated individuals, including Plaintiffs and the Class, as described herein.  Specifically, CDCR's promulgation and implementation of STG validation policies and practices unconstitutionally target Black incarcerated individuals (1) to be subjected to violence and the July 20, 2020 Raid; (2) for possession of materials of which non-Black incarcerated individuals are not validated; and (3) for validating as gang suspects, associates, or members, Black individuals based solely on their race and protected political speech concerning Black liberation without evidence of dangerous activity.

147.   CDCR's violation of Title VI has caused and will continue to cause Plaintiff and the Class to suffer harm and unequal access to programs within CDCR and opportunities for release.

148.   As a direct and legal result of CDCR's actions and/or omissions and/or in ratifying such acts or omissions, Plaintiffs and the Class have suffered and continue to suffer harm, damages, and injuries, including, without limitation, pain and suffering; emotional, psychological, and physical distress; loss of visitation rights, prolonged incarceration, violation of dignity; and other pecuniary losses not yet ascertained.

149.   CDCR engaged in these acts and/or omissions and/or ratified such acts and/or omissions

that were willful, malicious, intentional, and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiffs and the Class.

150. By reason of the continuous nature of CDCR's discriminatory conduct, the continuing violations doctrine applies to the violations alleged herein.

151. Plaintiffs and the Class are entitled to all legal and equitable remedies available for violations of 42 U.S.C. Section 2000d *et seq*., including, but not limited to, injunctive/declaratory relief, special and general damages, compensatory relief, economic relief, costs, and attorneys' fees.

**COUNT TWO**
**Violation of Equal Protection Based on Race**
**Fourteenth Amendment, 42 U.S.C. Section 1983**
**(On behalf of Plaintiffs and the Class Against all Defendants Except CDCR) (the "Count II Defendants"))**

152. Plaintiffs repeat and re-allege the allegations of all the preceding paragraphs as if fully set forth herein.

153. Defendant Allison – acting in her official capacity and under the color of law – and all other Count II Defendants – acting in their individual and official capacities – violated Plaintiffs' and Class Member's right to equal protection under the Fourteenth Amendment of the United States Constitution.

154. Under the Equal Protection Clause, discrimination based on race is presumptively unconstitutional and subject to strict scrutiny.

155. CDCR's policies and procedures permit CDCR officials to conduct a raid of approximately 200 Black people solely based on their race.

156. Count II Defendants conducted or were aware and did not prevent a race-based raid on 200 Black people on July 20, 2020.

157. CDCR's STG validation policies, established, maintained, and enforced by the Count II Defendants intentionally discriminate (or constitute a standard operating procedure to discriminate) against Plaintiffs and the Class due to their race as described herein, including, but not limited to (1) subjecting Plaintiffs and the Class to the July 20, 2020 Raid because of their race, (2) validating Plaintiffs and Class Members as suspects, associates, or members of an STG, and (3) targeting Black incarcerated

individuals for their possession of reading material, tattoos, contact information, drawings or quotes – particularly documentation related to Black history and Black liberation – and other such materials while allowing non-Black incarcerated individuals to have the same materials without consequence.

158.    The Count II Defendants are aware that the implementation of the validation policies is designed and used to discriminate against Black incarcerated people and cause harm and constitutional violations.   Specifically, the validation policies use race as a proxy for membership in STGs and allow for increased surveillance and targeting, prolonged sentences, race-based lockdowns and modified programs, the potential for extended time in administrative segregation, isolation from other individuals of all races, and excessive punishment.

159.    The Count II Defendants' standard operating procedure of discrimination against Plaintiffs and the Class is not reasonably related to legitimate penological interests, nor is it necessary for prison safety or discipline.

160.    Plaintiffs and the Class have been targeted, punished, and injured by the Count II Defendants because of their race without evidence of dangerous activity, or that the materials and means used to validate them into STGs was linked to security concerns, while subjecting non-Black incarcerated people to more favorable terms and conditions of confinement and permitting non-Black people in custody to have the same materials, personal relations, symbols, or tattoos without consequence.

161.    As a direct and legal result of the Count II Defendants' actions and/or omissions and/or in ratifying such acts or omissions, Plaintiffs and the Class have suffered and continue to suffer harm, damages and injuries including, without limitation, pain and suffering; emotional, psychological, and physical distress; loss of visitation rights, prolonged incarceration, violation of dignity; and other pecuniary losses not yet ascertained.

162.    The Count II Defendants engaged in the acts and/or omissions and/or ratified such acts or omissions, that were malicious, intentional, and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiffs and the Class, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

163.    By reason of the continuous nature of the Count II Defendants' discriminatory conduct, the continuing violations doctrine applies to the violations alleged herein.

164.    Plaintiffs and the Class are entitled to all legal and equitable remedies available for violations of 42 U.S.C. 1983, including, but not limited to, injunctive/declaratory relief, special and general damages, compensatory relief, economic relief, costs and attorneys' fees.

**COUNT THREE**
**Violation of Free Speech**
**First Amendment, 42 U.S.C. Section 1983**
**(On behalf of Plaintiffs and the Class Against Defendants Allison, Marion, Koenig, Barron, Peffley Coker, Cavagnolo, DeAnzo, and Hernandez (the "Count III Defendants"))**

165.    Plaintiffs repeat and re-allege the allegations of all the preceding paragraphs as if fully set forth herein.

166.    The Count III Defendants – acting in their own official capacity and under the color of law – have violated Plaintiffs' and Class Members' right to free speech under the First Amendment of the United States Constitution.

167.    The Count III Defendants' implementation of the STG validation policies and procedures violate the Free Speech Clause of the First Amendment by creating impermissible and vague content-based restrictions on incarcerated individuals' possessions, speech, thought, and expression.

168.    The STG validation policies are the moving force behind the free speech violations in that Plaintiffs and Class Members are targeted for possession of materials that relate to Black liberation politics, "civil rights, social justice, revolution and African American history."

169.    The Count III Defendants were aware that the type of constitutional violations complained of herein were caused by CDCR's STG validation policies.

170.    The policies and procedures described herein are unconstitutional on their face. They are so vague as to provide no basis for clear and consistent application, and they afford unfettered discretion to Defendants and other CDCR employees to censor a broad range of speech and thought.

171.    The STG validation policies and procedures are not reasonable or the least restrictive means by which to uphold safety and security within prison institutions. The Count III Defendants have not demonstrated that the possession of the materials used to validate individuals cause violence in the institution. The materials are not banned from the institution and are improperly used to surveil and punish Black incarcerated people who obtain them.

172. Moreover, the STG policies' suppression of free speech is not rationally or reasonably related to achieving a legitimate government purpose. The STG policies' suppression of free speech is arbitrary and unreasonable.

173. As a direct and legal result of the Count III Defendants' actions and/or omissions and/or in ratifying such acts or omissions, Plaintiffs and the Class have suffered and continue to suffer harm, damages, and injuries including, without limitation, pain and suffering; emotional, psychological, and physical distress; loss of visitation rights, prolonged incarceration, violation of dignity; and other pecuniary losses not yet ascertained.

174. The Count III Defendants engaged in the acts and/or omissions and/or ratified such acts or omissions, that were malicious, intentional, and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiffs and the Class, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

175. By reason of the continuous nature of the Count III Defendants' unconstitutional conduct and policies, the continuing violations doctrine applies to the violations alleged herein.

176. Plaintiffs and the Class are entitled to all legal and equitable remedies available for violations of 42 U.S.C. 1983, including, but not limited to, injunctive/declaratory relief, special and general damages, compensatory relief, economic relief, costs and attorneys' fees.

**COUNT FOUR**
**Conspiracy to Violate Civil Rights**
**42 U.S.C. Section 1983**
**(On behalf of Plaintiffs and the Class Against Defendants Koenig, Marion, Barron, Martinez, Villalobos, Lopez, Vera, Peffley, Coker, Cavagnolo, DeAnzo, and Hernandez (the "Count IV Defendants"))**

177. Plaintiffs repeat and re-allege the allegations of all the preceding paragraphs as if set forth fully herein.

178. The Count IV Defendants, acting in their individual and official capacity, conspired to violate the constitutional rights of Plaintiffs and the Class.

179. The Count IV Defendants reached an agreement among themselves to deprive the Black incarcerated individuals at CTF, including Plaintiffs, of their constitutional rights to be free from cruel

and unusual punishment, by targeting Plaintiffs and the Class because of their race, orchestrating and carrying out the Raid on July 20, 2020 that targeted Black incarcerated people, using the Raid to wrongfully validate Black incarcerated individuals as members, associates and suspects of STGs, and by covering name and badge numbers during the July 20, 2020 Raid, and refusing to provide information to identify the raiding officers.

180. The misconduct described herein was undertaken intentionally and with malice, and/or with reckless indifference to the rights of Plaintiffs and the Class.

181. As a direct and proximate result of the illicit prior agreement referenced herein, the rights of Black incarcerated individuals at CTF, including Plaintiffs and the Class, were violated and as a result, Plaintiffs and the Class suffered injuries, including pain, suffering, and emotional distress.

182. These injuries were caused by Defendants Martinez, Villalobos, Lopez, Vera, Peffley, DeAnzo, and Hernandez, who took part in the Raid, as well as Defendant Koenig who oversaw and took part in the Raid, and then conspired to cover up the constitutional violations that occurred during the Raid. Defendants Barron, Coker, and Cavagnolo also caused injuries by targeting Plaintiffs and the Class for validation.

183. The Count IV Defendants continue to this day to conspire to deprive Plaintiffs and the Class, of their constitutional rights and to protect one another from liability for the deprivation of those rights, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

184. As a direct and legal result of the Count IV Defendants' actions and/or omissions and/or in ratifying such acts or omissions, Plaintiffs and the Class have suffered and continue to suffer harm, damages, and injuries stemming from the Count IV Defendants' excessive force and validation tactics.

185. The Count IV Defendants engaged in acts and/or omissions and/or ratified such acts or omissions that were willful, malicious, intentional and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiffs and the Class, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

186. By reason of the continuous nature of the Count IV Defendants' discriminatory conduct, the continuing violations doctrine applies to the violations alleged herein.

187.    Plaintiff and the Class are entitled to all legal and equitable remedies available for violations of 42 U.S.C. 1983, including, but not limited to, injunctive/declaratory relief, compensatory relief, economic relief, costs and attorneys' fees.

**COUNT FIVE**
**Unreasonable Search and Seizure**
**Fourth Amendment, 42 U.S.C. Section 1983**
**(On behalf of Plaintiffs and the Class Against Defendants Koenig, Marion, Martinez, Villalobos, Lopez, and Vera (the Count V Defendants))**

188.    Plaintiffs repeats and re-allege the allegations of all the preceding paragraphs as if fully set forth herein.

189.    The Count V Defendants – acting in their individual and official capacities – violated Plaintiffs' and the Class's rights to be free from unreasonable search and seizure.

190.    The Count V Defendants unnecessarily and sadistically used force against Plaintiffs and the Class when they entered Plaintiffs' cells in the middle of the night when they was asleep without notice, used force against them and forced them to sit nearly naked and without personal protective equipment during the COVID-19 pandemic for hours or took part in the actions that allowed for this unreasonable search and seizure to take place without intervening.

191.    The Count V Defendants did not carry-out this search in a reasonable manner.

192.    The Count V Defendants' actions were unnecessary to ensure safety or order in the institution.  Plaintiffs were asleep in their cells when the Defendants entered their cells, they were subsequently stripped naked and forced to undergo group visual cavity searches.  Plaintiffs cooperated with the demands of Defendants and demonstrated no threat to the officers or the safety of the institution.

193.    The Count V Defendants had no valid reason to expose Plaintiffs to COVID-19.

194.    As a result of the Count V Defendants' unconstitutional conduct, Plaintiffs and the Class experienced pain, emotional distress, exposure to an infectious and deadly disease, and injuries.

195.    The Count V Defendants executed their unconstitutional Raid pursuant to a policy or practice ordered and/or overseen by Defendant Koenig, other supervisors at the CTF facilities, and other CDCR officials who have yet to be identified.  Upon information and belief, such a raid would not have been carried out without the express knowledge and approval of CDCR officials such as Defendant

Marion. Defendant Koenig was present during the Raid and was seen high fiving officers. Accordingly, Defendant Koenig, Marion and CDCR officials encouraged the misconduct in this case and in this way violated the rights of Plaintiffs at CTF by maintaining and implementing policies and practices that were the moving force driving the constitutional violations described herein.

196. As a direct and legal result of the actions and/or in ratifying such acts or omissions, the Count V Defendants have caused Plaintiffs and the Class to suffer harm, damages, and injuries stemming from Defendants' excessive force.

197. Defendant Koenig and Count V Defendants engaged in acts and/or omissions and/or ratified such acts or omissions that were willful, malicious, intentional and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiffs and the Class, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

198. Plaintiffs and the Class are entitled to all legal and equitable remedies available for violations of 42 U.S.C. 1983, including, but not limited to, injunctive/declaratory relief, special and general damages, compensatory relief, economic relief, costs and attorneys' fees.

## COUNT SIX
**Violation of the Right to be Free from Violence or Threats of Violence Due to Race and Political Affiliation**
**Ralph Civil Rights Act, California Civil Code § 51.7**
**(On behalf of Plaintiff Williams Against Defendants Marion and Koenig)**

199. Plaintiff Williams repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

200. Defendants Marion and Koenig, acting in their individual and official capacities, violated Plaintiff's right to be free from violence or threats of violence due to his race and political beliefs.

201. Plaintiff has a right to be free from violence or threats of violence due to his actual or perceived race and actual or perceived political affiliation. Defendants Marion and Koenig have violated the rights of Plaintiff by carrying out the June 20, 2020 Raid in which individuals were thrown out of the cell in the middle of the night, without warning, by force, and exposed to COVID-19 without personal protective equipment, and received threats of validation or actual validations.

202. Defendants Marion and Koenig carried out this Raid due to perceived or actual race and

political affiliation with Black independence, including Black Lives Matter.

203.    As a direct result of Defendants' actions, Plaintiff suffered physical and emotional harm. Plaintiff is entitled to all legal and equitable remedies including, but not limited to, injunctive/declaratory relief, actual and punitive damages, compensatory relief, economic relief, costs and attorneys' fees.

**COUNT SEVEN**
**Retaliation**
**First Amendment, 42 U.S.C. Section 1983**
**(On behalf of Plaintiff Williams Against Defendants Koenig, Barron, Mensing, and Peffley (the "Count VII Defendants"))**

204.    Plaintiff Williams repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

205.    The Count VII Defendants – acting in their individual and official capacities – violated Plaintiff's constitutional right to be free from retaliation.

206.    Plaintiff engaged in First Amendment-protected speech activity as described herein, including by reporting on conditions of confinement within CDCR institutions, filing complaints about the abuse he suffered by CDCR officers and Institutional Gang Investigators, and adorning his body with tattoos related to his religious beliefs.

207.    The Count VII Defendants retaliated against Plaintiff by subjecting him to increased surveillance, increased cell searches, false validation as a member of BGF, and Rules Violation Reports because of his political speech and actions.  The Count VII Defendants' actions are directly related to Plaintiff's complaints.  Indeed, correctional officers have admitted that they targeted Plaintiff due to the articles he wrote about prison conditions.

208.    As a direct and legal result of the Count VII Defendants' actions, Plaintiff has suffered and continues to suffer damages including, without limitation, pain and suffering, emotional, psychological, and physical distress, violation of dignity, loss of familial relationships; and other pecuniary losses not yet ascertained.

209.    By engaging in the aforementioned acts, the Count VII Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying an award of punitive and exemplary damages in

an amount to be determined at trial.

210.    The Count VII Defendants engaged in the acts and/or omissions and/or ratified such acts or omissions, that were malicious, intentional, and/or oppressive, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff and the Class, thereby justifying punitive and exemplary damages in an amount to be determined at trial.

**COUNT EIGHT**
**Battery**
**Cal. Gov. Code sections 820**
**(On behalf of Plaintiff Williams Against Defendants Koenig, Martinez, Villalobos, Lopez, and Vera)**

211.    Plaintiff Williams repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

212.    Defendants Koenig, Marion, Martinez, Villalobos, Lopez, and Vera– acting in their individual and official capacities – violated Plaintiff's right to be free from battery.

213.    Defendants Koenig, Marion, Martinez, Villalobos, Lopez, and Vera touched Plaintiff with the intent to harm or offend him as described herein.  Koenig, Marion, Martinez, Villalobos, Lopez, and Vera entered Plaintiff's cell around 3:30am, pulled him out of his bed, threw him to the ground, zip tied his hands and forced him to sit, cold and naked for hours without personal protective equipment placing him at risk of contracting COVID-19.

**COUNT NINE**
**Negligence**
**Cal. Gov. Code Sections 820**
**(On behalf of Plaintiff Williams Against Defendants Koenig, Martinez, Villalobos, Lopez, and Vera)**

214.    Plaintiff Williams repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

215.    Defendants Koenig, Martinez, Villalobos, Lopez, and Vera owed Plaintiff who was in their physical custody and control at CTF, a duty of care.

216.    Defendant Koenig breached his duty of care when he oversaw and participated in the Raid which resulted in physical injury, emotional suffering, and exposure to COVID by throwing Plaintiff

Williams out of his cell by use of force, without personal protective equipment and without social distancing protocols, and forcing Plaintiff Williams to sit while zip tied and handcuffed for over six hours in the CTF chow hall.

217. Defendants Martinez, Villalobos, Lopez, and Vera breached their duty of care, as described herein, including by entering Plaintiff Williams's cell, throwing him to the ground, zip tying him and forcing him to sit in the cold without personal protective gear surrounded by 200 other incarcerated individuals during the time of COVID.

218. Defendants' breach of their duties of care owed to Plaintiff Williams caused Plaintiff injury or served as a substantial factor in his harm. As a direct and foreseeable result of Defendant's negligent acts or failures to act, Plaintiff suffered this harm.

**COUNT TEN**
**Intentional Interference with Civil Rights**
**Bane Act, Cal. Civ. Code section 52.1**
**(On behalf of Plaintiff Williams against Defendants Koenig, Martinez, Villalobos, Lopez, Vera, Barron, and Mensing (the "Count X Defendants"))**

219. Plaintiff Williams repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

220. Defendants Koenig, Martinez, Villalobos, Lopez and Vera – acting in their individual and official capacities – intentionally interfered with Plaintiff's right to be free from cruel and unusual punishment under California Constitution Art. I section 17 and the Fourth Amendment to the United States Constitution by threat, intimidation, and coercion by carrying out the July 20, 2020 Raid in a violent and excessive manner causing harm to Plaintiff Williams.

221. Defendants Koenig, Barron, Mensing – acting in their individual and official capacities – intentionally interfered with Plaintiff Williams's right to be free to pursue his rights, speak and seek redress for his grievances under Sections 1-3 of the California Constitution by carrying out Plaintiff Williams's validation due to his race, political beliefs and speech, in a manner that caused harm to Plaintiff Williams.

222. As a direct and legal result of the actions and/or omissions of Defendants' actions, Plaintiff Williams has suffered and continues to suffer damages including, without limitation, physical injury; pain

and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

223.  Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff Williams, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as follows:

a.  Certification of the class claims identified in this action as a class action under Federal Rule of Civil Procedure 23 on behalf of the Class;

b.  Designation of Plaintiffs as the Class Representatives of the Class;

c.  Designation of Plaintiffs' counsel of record as Class Counsel and monitors of CDCR's compliance with federal standards and California law;

d.  A declaratory judgment that that Defendants' policy and practice of discriminating against Black incarcerated individuals as complained of herein violates applicable law;

e.  For injunctive relief enjoining CDCR and Defendants Allison to:

(1) Prohibit Defendants from engaging in any conduct violating the constitutional rights of Plaintiffs and Class Members as secured by applicable law and other such injunctive relief as will prevent Defendants from continuing discriminatory practices and from engaging in any further unlawful practices, policies, customs, usages, and discrimination as set forth herein;

(2) Requiring Defendants to update Plaintiffs' and Class Members' records to erase mention of STG validation;

(3) Requiring Defendants to develop, adopt, and apply written policies, to be approved by the Court, which will ensure Defendants' compliance with federal standards and California law;

f.  For compensatory, general and special damages, in an amount to be determined at trial;

g.  For punitive damages in an amount to be proven at trial;

h.  For reasonable attorneys' fees and costs to Plaintiffs and the Class pursuant to 42

U.S.C. Section 1988; and

i.     Such other relief as the Court finds appropriate in the interest of justice.

Dated: November 30, 2022                    Respectfully Submitted,

_____

Jennifer Orthwein
Felicia Medina
Shauna Madison
Mackenzie L. Halter
MEDINA ORTHWEIN LLP

Dan Siegel
Anne Butterfield Weills
SIEGEL, YEE, BRUNNER & MEHTA

*Attorneys for Plaintiffs and the Class*

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully request trial by jury.

Dated: November 30, 2022                    Respectfully Submitted,

_____

Jennifer Orthwein
Felicia Medina
Shauna Madison
Mackenzie L. Halter
MEDINA ORTHWEIN LLP

Dan Siegel
Anne Butterfield Weills
SIEGEL, YEE, BRUNNER & MEHTA

*Attorneys for Plaintiffs and the Class*